## UNITED STATES v. GOODMAN.
### Civil No. 1054.

United States District Court
W. D. North Carolina, Asheville Division.
March 12, 1953.

T. A. Uzzell, Jr., Asheville, N. C., J. B. Craven, Jr., Morganton, N. C., for plaintiff.

J. M. Horner, Asheville, N. C., for defendant.

WARLICK, District Judge.

The United States, in its complaint filed in this action, seeks to recover the sum of $12,204.42, as damage on account of repairs allegedly made on four machines purchased of the defendant. The whole of the controversy is embraced in two contracts entered into by the plaintiff through one of its agencies, and the defendant. The answer filed is a general denial of any responsibility; a counter claim of $750.00 was set up but is abandoned in its prosecution. The cause was submitted to the court for hearing without a jury.

On June 8, 1943, the Soil Conservation Service of the United States Department of Agriculture at Milwaukee, Wisconsin, sent out invitations for bids on used "draglines" for use in rehabilitating drainage ditches and new drainage construction in eight of the mid-western states which were operated by this department from Milwaukee headquarters, seeking competitive bids on certain enumerated items of machinery. It again on June 12, 1943, sent out invitations for similar types of machinery for use in the same areas.

The defendant, one among those of the 230 odd dealers to whom the invitations in

both instances were forwarded, having certain machinery which could be classified as that desired by the plaintiff, submitted bids in both invitations under dates of June 14, and June 15, 1943, and on June 23, acceptances were made and approved from among the defendants items of machinery, and contracts of award were made by the terms of which the plaintiff purchased from the defendant these machines:

1A - Koehring drag-line Model 301, Machine #431, at the price of $8,500.00.

1B - Northwest drag-line Model 105, Machine #1282, at the price of $7,750.00.

1A - Northwest 105, ¾ cubic yard bucket, #1286, at the price of $8,000.00

4A - Insley drag-line Model "R", ½ cubic yard bucket, at the price of $4,750.00.

These machines were all located in or near the defendant's place of business in Asheville, North Carolina, and in his offer to do business under the invitation of the plaintiff, each was described and the respective age in each instance given. The various ages being between nine and twelve years, and all were described as second-hand machines,—reconstructed and otherwise. Each contract of purchase and sale was identical in terms.

The material provisions of the contracts involved in this controversy are found in the following two paragraphs:

"Guarantee: Bidders must guarantee that the equipment is in good operating condition, and that all parts found defective, over and above ordinary wear and tear, within a 90 day period after the equipment is placed in operation by the Government must be replaced by the successful bidder, without cost to the Government.

"No award will be made until the equipment has been inspected by an authorized representative of the Government, and the decision of the Government as to the acceptability of equipment, based on the inspector's report, will be final. The equipment shall be made available at location, for actual operation by the Government inspector, and said inspector shall be permitted to make as complete tests as he deems advisable. All operation costs incurred during inspection shall be at bidder's expense. The inspection of the equipment by a Government representative, however, will not relieve the bidder's responsibility under the guarantee clause noted above."

At about the time of the execution of these contracts of purchase, a representative of the plaintiff came to Asheville and inspected three of these machines. One Charles P. Jamerson, head of the Regional Equipment Section of the Soil Conservation Service of Spartanburg, South Carolina, was authorized and directed to make inspection of this equipment and on June 22 and June 23, 1943, inspected these machines—the Koehring, the Northwest 1286, and the Insley and also casually looked over the Northwest 1282. The Koehring machine was being operated on Beaver Creek on the outskirts of Asheville at the time of the inspection. The other machines were at various places on the yard of the defendant.

The inspection made of these machines indicated that certain repairs were needed *so that the equipment would be in good operating condition* and lists thereof in each instance of the things to be done were made up by the inspectors and submitted to the defendant. These various defects were corrected in each instance and the three machines inspected by Mr. Jamerson when delivered to the common carrier for delivery to the designated agencies apparently had all of the defects corrected. The other and fourth machine, being Northwest Model 105, serial 1286, was inspected by one F. Brooks Warren, Equipment Supervisor of the Soil Conservation Service on August 16, 1943. Following his inspection an itemized list of repairs was made up indicating that when these were completed that the machines would then be accepted by the department (defendant's Exhibit #2). The evidence further indicates that these repairs were made at the plant of the defendant

and that when the machine was delivered to the common carrier, that it was in good operating condition.

When one considers that the inspections of the machines in this controversy were had on June 22 and June 23, and August 16, 1943, in Asheville, it is rather significant that in the statement and certificate of award dated June 23, 1943, in Milwaukee, Wisconsin, that the following is a part thereof:

"The field of competition was adequately solicited, the machines accepted were inspected and found to meet all service requirements, prices quoted are just and reasonable and the lowest obtainable for equipment of this type meeting Service requirements, and award has been made accordingly to Al J. Goodman, Asheville, North Carolina."

For a just decision of the merits of each of the four individual sales to the plaintiff, it becomes necessary to find the facts in each instance so that the proper conclusion can be aptly made.

The Insley, first of the machines delivered, was sent to Hillsboro, Illinois, and later conveyed from the railroad siding to Raymond, Illinois, and unloaded on July 14, 1943, and actually put into operation on August 24, 1943. It was operated for a total of 240 hours and up to and including October 22, 1943, when it was set aside and ultimately in 1944 as will subsequently appear, the plaintiff expended $3,367.00 in repairing this machine.

The Northwest #1282 was unloaded on July 15, 1943, at Worthington, Indiana and was actually put to work on August 11, 1943, and worked for a total of from 74 to 100 hours, being operated by one Arthur Wright, an experienced operator of dragline machines, for many years, and when certain parts were broken it was then put on a railroad siding in Worthington and remained there until sometime in late 1944 when a contract was let and certain repairs were made to it, totalling approximately $6,223.02.

The Koehring machine was received about July 15, 1943, at Elinor, Indiana, but was not put into operation until around March 1, 1944, when one breakdown came about following approximately 23 hours of actual operation. This was repaired and the machine was then used until sometime in the fall of 1944 when it was transferred to another station in Indiana. The one breakdown in labor and materials cost $346.46.

The Northwest 1286, inspected first on August 16, 1943 when the letter addressed to the defendant of that date and written by the inspector, F. Brooks Warren (shown as defendant's exhibit #2) was subsequently inspected by Mr. Warren on September 15, 1943, at which time the machine was partially torn down and the repairs enumerated in said letter were being made. Previously and on August 17, 1943, this machine was withdrawn from immediate shipment to the plaintiff and Northwest 1282 was substituted therefor, with this machine being stored by the defendant. It was subsequently shipped by rail and was received and unloaded in Illinois on December 3, 1943, and conveyed under its own power two miles to the place where it was to be put into work, when certain parts in the tread and track were broken. Necessary repairs were made, and on January 3, 1944, it was again put into operation on a ditch then being dredged. A considerable number of defects developed; ice and frost were encountered; freezes of great intensity came about, and the machine was finally set aside in February 1944, brought about from certain breakdowns, weather conditions, and other factors. Subsequently, the plaintiff on contracts let, expended $2,914.59 in its repair.

The total amount of the agreed purchase price in each instance, with the exception of $750.00 has been paid by the plaintiff to the defendant.

During the month of December 1943 and after repeated efforts had been made, one Thomas, an experienced employee of the defendant, was sent by him to inspect these machines and to do what would appear necessary to put them into proper working condition, following complaints of the plaintiff. He and F. Brooks Warren, repre-

senting the government, went to the states of Indiana and Illinois, worked on two of these machines, placing quite a number of new parts and expended monies in the neighborhood of $1200.00 in their undertaking to completely rehabilitate the machines and put them in a condition that would be satisfactory to the plaintiff. These expenses were paid by the defendant.

After more than seven years had elapsed the file herein was forwarded to the District Attorney, and on July 5, 1950, this action was instituted in this court, and reached trial more than two years thereafter. The delay in the trial from the time of the actual filing of the action came about from the physical condition of the defendant who from evidence submitted from time to time, was confined following various operations in hospitals in and out of North Carolina. Several of the parties who were familiar with the facts and whose testimony would have been of value, have died.

█ This case is very difficult of decision. The plain truth of the matter is that it is well nigh impossible to determine with any degree of certainty, a breach thereof, and if such, the damage that would flow directly therefrom. "It is an elementary principle that all damages must flow directly and naturally from the wrong, and that they must be certain, both in their nature and in respect to the cause from which they proceed." Shearman & Redfield on Neg. Secs. 25, 26. Johnson v. Atlantic Coast Line R. R. Co., 184 N.C. 101, 113 S.E. 606, 25 A.L.R. 910.

█ The true rule of estimating damages in actions ex contractu may be stated thus: "The defendant is liable only for damages as may fairly and substantially be considered as arising naturally, i. e., according to the usual course of things, from the breach of the contract, or * * * for whatever damages [it] may fairly be supposed to have been within the contemplation of the parties." Johnson v. Atlantic Coast Line R. R. Co., 184 N.C. at page 104, 113 S.E. 606, 607; Virginia-Carolina Peanut Co. v. Atlantic Coast Line R. Co., 155 N.C. 148, 152, 71 S.E. 71.

The doctrine is better stated in Hale on Damages as follows:

"In an action for damages, the plaintiff must prove, as part of his case, both the amount and the cause of his loss. Absolute certainty, however, is not required, but both the cause and the amount of the loss must be shown with reasonable certainty. Substantial damages may be recovered though plaintiff can only give his loss proximately." Hale on Damages, p. 70. Bowen v. Harriss, 146 N.C. 385, 59 S.E. 1044; Wilkinson v. Dunbar, 149 N.C. 20, 22, 62 S.E. 748; American Lumber Co. v. Quiett Mfg. Co., 162 N.C. 395, 398, 78 S.E. 284.

"Damage recoverable must be the *natural and proximate results of the wrong* complained of and, in actions ex contractu, such as may fairly be supposed to have entered into the contemplation of the parties when the contract was made—that is, such as might naturally be expected to follow its violation." 15 American Jurisprudence, "Damages", Sec. 20, page 412.

█ It is evident that the parties set up their own formula for the estimation of damage in the event of a breach. First we find that there is provided that the defendant in his bid guaranteed that the equipment was in good operating condition. This naturally amounts to an express warranty. "When the seller makes affirmation with respect to the article to be sold, pending the treaty of sale, upon which it is intended that the buyer shall rely in making the purchase", such is an express warranty, and amounts to "representations and statement of and concerning the condition and quality of personal property, the subject of sale made by the person making the sale to induce and bring it about." Underwood v. Coburn Motor Car Co., 166 N.C. 458, at page 460, 82 S.E. 855, 856.

Then again the defendant obligated himself to replace all parts found defective, over and above ordinary wear and tear, within a 90 day period after the equipment is placed in operation without cost to the government.

It would appear that the plaintiff predicated its action on either or both of the two clauses of the contract of sale.

1. Specific Warranty that the machine be in good operating condition, and

2. Specific Covenant of Warranty that the defendant would replace all parts found defective over and above ordinary wear and tear within the 90 day period, after the equipment is placed in operation.

So it would make little if any difference which of the rules one might apply. Ordinarily the measure of damage in the first instance above is the difference in value of the machine as it was represented and warranted to be and as it really was at the time of its purchase, or the replacement of the parts found defective over and above ordinary wear and tear within the period set out in the contract.

The plaintiff, in the evidence offered, seemed, however, to rely wholly upon the total cost to it under bids sought and contracts awarded as the guide post in the estimation of damage. It is rather singular and it certainly would appear that much of the work done and the repairs placed came about from its desire to more or less rebuild the machines after they were torn down with materials and parts which would lengthen the life of the machine beyond the period of time when the defendant would be liable. Instance after instance of this appears in the evidence. In the testimony of the plaintiff's witness, Martin T. Ekovich, we find this statement in his evidence, on page 25 of the record:

"Q. I'll ask you if, on the bottom of this list, there wasn't there a notation, 'In regard to the above parts, several are worn considerably to where they will have to be replaced in approximately six to nine months. The complete track assembly is listed and about half the track threads and all pins are worn to where they need replacement.'

"A. That is correct, surely, and the reason for that is as long as you take the machine down, let's make it in real good shape and put those parts on.

"Q. I'll ask you if you didn't also say in that letter, 'The machine will probably operate 90 days with these same roller shafts but there will be undue wear to the tracks and undue power?'

"A. That is correct. If you are going to put new tracks on, you ought to have new rollers."

This clearly indicates that on all of the machines repaired many new parts were added and much labor was used which could not have been in contemplation of the parties when the contract was entered into. Yet from the standpoint of the plaintiff was probably an act of good husbandry in the rehabilitation of the machines while torn down, but by no stretch of the imagination could it be chargeable under the terms of the contract to the defendant.

From the foregoing findings of fact I conclude that the plaintiff is entitled to have and recover of the defendant the following sums:

For the breach of the contract in the sale and delivery of the Insley, the sum of $ 845.00
For the Northwest 1282, the sum of 2,150.00
For the Northwest 1286, the sum of 900.00

I find that the Koehring machine complies in every particular with the guarantee, and deny a recovery thereon.

Counsel will submit judgment.